**James L. PUCKETT, Appellant,**

**v.**

**Minor CLARK, William H. Chambliss and Hess Henson, Appellees.**

Court of Appeals of Kentucky.

Nov. 18, 1966.

Charles A. Williams, R. L. Myre, Holland G. Bryan, Paducah, for appellant.

Joseph J. Leary, Thomas F. Marshall, Frankfort, for appellee.

PALMORE, Chief Justice.

This is a suit for malicious prosecution in which the plaintiff, Puckett, appeals from a judgment n. o. v. rendered in favor of the defendants after he had been awarded $5,000 by a jury verdict.

Puckett was arrested on a complaint and warrant charging him with unlawful possession of an illegal fishing device in McCracken County. He was acquitted. The complaint had been signed by the appellee Chambliss, a state conservation officer, who was accompanied at the time by the appellee Henson, Assistant Director of Law Enforcement for the Department of Fish and Wildlife Resources of Kentucky. The appellee Clark is Commissioner and chief administrative officer of that Department, and it was he who instigated the inquiry that eventuated in the accusation and arrest of Puckett.

The only issue we find it necessary to consider is whether the evidence was rea-

sonably sufficient to support a factual conclusion (as drawn by the jury) that the proceeding against Puckett was instituted without probable cause.

The February 5, 1963, issue of The Courier-Journal carried a photograph showing the appellant, Puckett, holding up for display a fishing line or lines to which several hooks and multiple hooks were attached. The following caption and text appeared below the picture:

"MULTIPLE HOOKS USED TO SNAG FISH"

"PLEADS GUILTY * * * James Puckett, 32, West Gilbertsville, fined $75 on each of two charges involving illegal fishing, holds line with multiple hooks used to snag fish from the Tennessee River below Kentucky Dam. (Story and another picture are on page 1.)"

The story on page 1, which was tendered in evidence by Puckett but not admitted, was to the effect that snag or jerk fishing in the river below Kentucky Dam was giving the area a bad name and was costing local innkeepers and other business interests a great deal of money through loss of tourist trade. One Herman Donohoo, speaking for a group of motel operators, had protested, "We make our living off of tourists who fish for the sport, and if they quit coming here we'll have to close up." The article continued in part as follows:

"The protests came in the wake of a protest about State Fish and Wildlife Department enforcement officers by James Puckett, 32, West Gilbertsville, who was arrested at 2:30 a. m. Thursday for snag fishing from a boat just below Kentucky Dam.

"Puckett and a companion, Jesse Phelps, Aurora, pleaded guilty to illegal fishing and fishing in restricted water, in Livingston County Court, and were fined $75 each. Their boat, oars, and the 100 pounds of fish they had were confiscated.

"Puckett claimed that the same day he and Phelps were arrested, 50 to 75 persons snag-fished from the bank below Kentucky Dam with apparent immunity. He said wildlife enforcement officers are ignoring illegal activities of bank snag fishermen in the area.

"While snag fishing from a boat is illegal, State law permits the same type of fishing from a bank provided only one treble hook is used and the pole is not more than 7 feet in length. There also is a limit of 15 fish for bank snagging, and each fish taken must be counted in the limit and placed on a stringer.

"Puckett charged that most of the bank snaggers sell their catches at nearby markets and restaurants the same as he and Phelps, but rarely do they count all the fish they take.

"Two days prior to his arrest, Puckett said bank snaggers sold more than 800 pounds of catfish on the Gilbertsville market. The current wholesale price for catfish at Gilbertsville is 30 cents a pound.

"Donohoo said his group feels that widespread fishing-law violations in this area won't be curbed until Kentucky bans all forms of snag or jerk fishing.

"State Wildlife Commissioner Minor Clark, who met with First District enforcement officers Friday, reportedly viewed bank snag fishing below Kentucky Dam Wednesday.

"Observed by Reporter

"This reporter visited the bank area below Kentucky Dam Friday and counted 34 snag fishermen. They were snagging fish almost as fast as they could cast and jerk their lines. I saw no stringers. The fish were piled at the side of the fishermen. Small fish taken off the hooks were thrown into the crevices of the limestone rock which lines the bank."

A photograph accompanying the front page story showed a crowd of people fishing from the rock shore below Kentucky Dam. The article was written and the photographs had been taken by Harry Bolser, of Padu-

cah, manager of the newspaper's West Kentucky Branch.

KRS 150.120(4) prohibits the possession of any device for taking fish that is not expressly recognized and sanctioned under the provisions of KRS Chapter 150, and KRS 150.990(2) makes the offense punishable by a fine of not less than $15 or more than $100. KRS 150.120(1) directs the commissioner and all conservation officers to seize any illegal devices found in the unlawful possession of anyone. The arrest and prosecution out of which this lawsuit arose came about in the following way:

On the morning of February 5, 1966, in Frankfort, Mr. Clark saw the picture of Puckett in The Courier-Journal. He thought that probably the contrivance shown in Puckett's possession was an illegal device for jerking fish. He knew his department had been subjected to criticism for the alleged lack of law enforcement in the area. By telephone he sought the advice of Hon. Burton Aldridge, county attorney for Trigg County, whom he knew to be familiar with laws of this nature. At this point there are discrepancies in the recollections of the various persons involved, but we do not regard them as vital. Either the newsphoto had already been called to Aldridge's attention by the appellee Henson or else Aldridge got hold of a paper and saw it at Clark's request. Anyway, Henson happened to be in Aldridge's office at Cadiz and they both talked to Clark, who asked Aldridge's opinion whether the man shown in the picture "was in violation of the law." Aldridge replied that he was not sure at the moment but would like to talk to Mr. Bolser and ascertain the circumstances under which Puckett had the contrivance in his possession.

The next day, February 6, Aldridge and Henson went to Paducah and saw Bolser at his home. On the way they stopped at Camp Currie in Marshall County, where at Clark's request they conferred with Paul Winstead, the resident Regional Director for the Department. Also at Clark's direction and after further telephone conversations with him, the three men proceeded to Paducah and were met there by William Chambliss, conservation officer for Livingston County, following which they all went to Bolser's home. (Chambliss is the officer who had theretofore arrested Puckett on the occasion mentioned in Bolser's February 5 front page article.)

Here again there are inconsistencies in the testimony, but again we are of the opinion that they are not as significant as counsel for Puckett would have it.

Bolser said that on February 4 or thereabout he had been called on the telephone by an unidentified person and asked if he wanted a story on the jerk fishing below Kentucky Dam, to which he replied in the affirmative. As instructed by the caller, he then met Puckett at the Irvin Cobb Hotel and Puckett asked him if he "wanted to see something like what they were fishing with up there * * * And my best recollection is that he left and came back with this hook—contraption with hooks on it wrapped around either pasteboard or stiff paper or something, and he unraveled it and I took a picture of it."

Bolser's version of the interview with the officers at his home was that most of the conversation was between himself and Henson. He and Aldridge were acquaintances, and he testified that as best as he could remember Aldridge, after remarking that he was not involved in this thing but had come to Paducah on other business, left the room. Aldridge, on the other hand, said that he asked Bolser whether the apparatus shown in the picture was already assembled when he first saw it, and whether Puckett had disassembled it afterward, and that Bolser replied to the effect that Puckett brought it pre-assembled, wrapped around a piece of paper, and did not disassemble it. Having gained this information, said Aidridge, "I was of the opinion that the man was in possession of an illegal device for taking

fish." He so advised the conservation officers and accompanied them to the office of Hon. W. P. McMurry, county attorney for McCracken County.

Mr. McMurry, after examining the picture of Puckett and ascertaining the circumstances under which it was taken, expressed the opinion that the contrivance was an illegal fishing device possessed in McCracken County and that they were entitled to a warrant. He proceeded to draw the necessary papers, Chambliss signed the complaint, the warrant was issued by the county judge, and in due course Puckett was arrested, tried and ultimately acquitted.

Still another discrepancy in the evidence exists as between what Bolser said he told (or did not tell) the officers and what McMurry says they told him. According to McMurry, "They told me that Mr. Puckett, James Puckett, who is the man in the picture, had contacted Mr. Bolser and informed him that this was a device similar to the device he had been arrested with some days before up in another county, Livingston or Marshall or some county. I concluded from that that it was a jerk line and that it was an illegal fishing device," etc. Bolser on the other hand denied having reported to the officers that Puckett had made such a statement to him.

We have come at last to the crux of the legal problem in the case. Advice of counsel is a complete defense to a claim of malicious prosecution "if all the facts bearing upon the guilt or innocence of the accused person which the prosecutor or informant knew or could have ascertained by reasonable inquiry, are fully and fairly disclosed to counsel. * * Under conflicting evidence, this is a jury question." Smith v. Kidd, Ky., 246 S.W. 2d 155, 159 (1952). More accurately stated, the conclusiveness of the defense is conditioned on a full and fair disclosure of *material* facts to the attorney whose advice is sought. Cf. Reid v. True, Ky.,

302 S.W.2d 846, 847 (1957), wherein it is pointed out also that since public policy favors the exposure of crime, and malicious prosecution actions are not favored in the law, a plaintiff has the burden of making a *clear showing* of no probable cause.

It is argued in Puckett's behalf that Bolser's testimony and McMurry's testimony provided a basis on which it was reasonable for the jury to find that the officers misrepresented a material fact to McMurry.

From the newspaper account alone, say counsel, one would assume that the contrivance shown by Puckett to Bolser was a legal rather than an illegal device when used from the shore, whereas additional (and erroneous) information to the effect that it was the same kind of contraption he had been arrested for using several days previously would justify counsel in concluding it was an illegal device. We find this theory difficult to follow. In the first place, regardless of what Puckett did not tell Bolser, and Bolser did not tell the officers, it was reasonable for the officers to assume that the device shown by Puckett to Bolser *was* the same type of contrivance he had been arrested for using. In fact, we draw the same conclusion not only from the newspaper photograph and text below it but also from Puckett's testimony in this case. What was its relevance and why did he show it to a newspaper reporter if it was not? And if Puckett himself did not think it was illegal, what would have been the significance and newsworthiness of the revelation that the Department was condoning its use by hundreds of fishermen on the banks below the dam?

In the second place, if it is only the *manner in which a device of this sort is used* that makes it illegal, that Puckett had been arrested while using it on a previous occasion was certainly irrelevant to a determination by the county attorney as to whether his possession of it at the

Irvin Cobb Hotel was unlawful. And lastly, we cannot imagine that a prosecuting attorney with the experience and competence possessed by Mr. McMurry would or did base such an opinion on information that the man had been "arrested" in another county for using the device. To sum up, what we are saying with regard to the accuracy of what the officers informed McMurry they had been told by Bolser is that it was not and could not have been a material inducing factor in the formation of his legal opinion and advice.

Nevertheless, if it be conceded otherwise, there is still the advice of Mr. Aldridge, another competent attorney. It is of no importance whether he conferred personally with Bolser or got the facts thereafter from the officers who did. In either event he had the facts and gave the opinion. But, it is insisted, he was not "disinterested." Why not? Because he assisted in the investigation and gave the advice? If so, every conscientious lawyer becomes "interested" by representing the person who seeks his advice and, perforce, the advice can be no defense. That simply cannot be the law.

One other failure to make full disclosure of the facts is suggested. Puckett testified that he works during part of the year as a commercial fisherman and that he held a commercial fishing license. That information was not provided to Mr. McMurry. Neither, however, has it been shown that any of the officers knew it. But aside from that, it was not a material circumstance. Had it been so, Puckett might not have found it necessary to plead guilty in the Livingston County case.

After all the travail of this case one thing seems clear to us, and that is that the laws and regulations pertaining to "snag" fishing and "jerk" fishing and the possession of gear designed for such purposes were not clear. It strikes us that the officials herein sued went to great lengths in an effort to make certain that their grounds for proceeding against Puckett were valid. Conceding even, for the argument, that they were overzealous in prosecuting him, that they were unjustly motivated by a conspiracy to "shut his mouth," still they had, as we view it, reasonable grounds to believe he was guilty. If one has probable cause to believe another has committed a crime it can make no difference that in charging him with it the accuser may also satisfy a personal animus.

"While, as the name implies, malice is the root of the action of malicious prosecution, malice alone, even when extreme, is not enough; want of probable cause for the institution of the original proceedings whether civil or criminal, must also be shown." 34 Am.Jur. Malicious Prosecution § 46 (1941).

It is our opinion that the evidence did not justify submission of the case to the jury, that the same would be true had the matters preserved by avowal been admitted, and that the judgment of the trial court was correct.

The judgment is affirmed.

STEWART, J., not sitting.